EUREKA INVESTMENT CORPORA-
TION, N. V., Plaintiff,

v.

CHICAGO TITLE INSURANCE
COMPANY, Defendant.

CHICAGO TITLE INSURANCE
COMPANY, Plaintiff,

v.

EUREKA INVESTMENT CORPORA-
TION, N. V., Defendant.

Civ. A. Nos. 80–1014, 80–2021.

United States District Court,
District of Columbia.

Jan. 14, 1982.

---

Stephen M. Sacks, Lawrence V. Stein, Washington, D. C., for Eureka Inv. Corp.

Stanley C. Morris, Jr., Roger E. Warin, Washington, D. C., for Chicago Title Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

These consolidated actions involve a dispute over a title insurance policy which

Eureka Investment Corporation, N.V. ("Eureka") secured in February, 1979, from Chicago Title Insurance Company ("CTI") to insure certain real property in the District of Columbia known as Carrollsburg Square.

Eureka acquired an interest in this group of rental apartments and town houses with the intention of converting the units into condominiums and selling them to the public. Shortly after Eureka announced its plans to convert, the tenants, relying on certain statutory protections existing under the law of the District of Columbia, mounted a well-organized campaign to block the conversion by litigation and other means. Eureka's title policy specifically insured against loss or damage caused by any attempt by the tenants to enforce their statutory rights. CTI acknowledged that the tenant actions placed a cloud on title and agreed to pay Eureka's legal expenses in opposing the tenants. Over the course of the ensuing months Eureka's representatives held settlement discussions with the tenants and discussed the advisability of settlement and other options with CTI. For reasons that will appear, Eureka and CTI ultimately failed to agree on a common plan of action and Eureka entered into a settlement agreement with the tenants without the consent of CTI.

Following this rupture CTI filed an action in the Northern District of Illinois for a declaratory judgment that it had met its obligations under the policy and Eureka filed an action in this Court to recover the cost of the settlement and damages due to delay in converting Carrollsburg Square caused by the tenants. CTI's declaratory judgment action was transferred to this Court and the two cases were consolidated for trial. After a bench trial the Court must now determine whether Eureka's unilateral settlement with the tenants was permitted by the terms of the policy or excused by CTI's prior breach of the policy, and, if so, to what extent Eureka may recover the

costs of the settlement and on its claim for delay damages.

## I. BACKGROUND

The title insurance policy deviated from CTI's standard title insurance form in one respect which is the focus of this litigation. CTI's standard policy contains an exception for claims asserted by tenants. This provision was stricken in favor of a special Note II which provided:

> The policy insures against loss or damage arising out of an enforcement or attempted enforcement of the rights, if any, of Tenants in the property pursuant to the provisions of Section 602 of the Rental Housing Act of 1977 (District of Columbia Law 2–54) or the Emergency Multi-Family Rental Housing Purchase Act of 1979, as the same may be amended.[1]

Section 602, as amended in October, 1978, provided that an owner of multi-family housing could not sell without giving the tenants advance notice and an opportunity to purchase the building and, where no eligible tenants organization existed, time to form a tenants organization capable of purchasing the building.

Eureka announced on April 30, 1979, that it intended to convert one of the large apartment buildings in the Carrollsburg Square complex. Promptly thereafter the tenants claimed that their rights under section 602 had been violated since the prior owner of Carrollsburg Square had not given the tenants advance notice of the sale to Eureka or the opportunity to organize a tenants association. On May 9, 1979, the tenants asked the District of Columbia Rent Administrator to conduct an investigation to determine whether their 602 rights had been violated. After a hearing the Rent Administrator dismissed the tenant petition. This decision was appealed, and on August 14, 1979, the D. C. Rental Accommodations Commission reversed the decision of the Rent Administrator in part and issued an order enjoining Eureka from pro-

---

1. It is stipulated that CTI had not issued any other policy in the District of Columbia containing language similar to Note II and that

Carrollsburg Square was the first condominium conversion project in the District on which CTI issued title insurance.

ceeding with the conversion. The Commission remanded the matter to the Rent Administrator to consider whether Rozansky & Kay Construction Company, which had assigned the purchase contract for Carrollsburg Square to Eureka, had violated the Rental Housing Act. Eureka then appealed the injunction to the D. C. Court of Appeals. A motion for summary reversal or stay pending appeal was denied and the order remained in effect until January 4, 1980, when the Commission vacated its order following the D. C. Court of Appeals grant of the Commission's request for a remand.

By this time, however, the tenants had raised other legal obstacles to Eureka's conversion plans. The Rent Administrator on remand from the Commission concluded that Rozansky & Kay had violated section 602. Relying on this decision the tenants brought suit in the Superior Court of the District of Columbia to enjoin the conversion pending appeal. In addition, on December 27, 1979, acting on a tenant petition, the D. C. Department of Housing and Community Development sent a letter to Eureka threatening to issue a cease-and-desist order to prevent Eureka from proceeding with the conversion until questions surrounding the title were resolved.

The tenant actions had the effect of making the individual condominium units unmarketable and therefore prevented Eureka from proceeding with the conversion. Eureka vigorously opposed the tenants' actions and kept CTI fully and promptly advised of all the developments described above as they occurred. Upon receiving notice of the tenant actions, CTI promptly agreed that they were within the risks covered by Note II and agreed to pay all of Eureka's legal expenses in opposing the tenants.

As the prospect of a prompt resolution of the dispute with the tenants became more uncertain Eureka became convinced that settlement with the tenants was the wisest solution to its business problem. Eureka had always contemplated a quick sell-out to pay off loans needed for the purchase and to realize quick profit from the venture. While the tenants were not expected to succeed,[2] Eureka believed it faced uncertain but potentially serious losses due to delay of its anticipated schedule for converting the apartments.

Commencing in the fall of 1979, Eureka held strenuous settlement negotiations with the tenants. By January, 1980, the tenants had reduced their demands to the point that Eureka believed it could arrange a reasonable settlement. During January and early February representatives of Eureka had several meetings with CTI officials to work out a basis upon which CTI would agree to issue "outsale" policies insuring title to individual condominium units so that closings could commence. CTI objected to the settlement on the ground that the amount Eureka was willing to pay the tenants was unreasonably high and refused to issue outsale policies based on the proposed settlement except on the condition, among others, that Eureka pay the entire cost of the settlement. CTI also refused Eureka's suggestion that it issue outsale policies so that sales of condominiums could proceed during the course of the litigation. Other possible solutions were discussed without agreement.[3] CTI instead proposed that the litigation with the tenants be pursued to a final determination. This, like other alternatives, was rejected by Eureka.

Eureka, without obtaining the consent of CTI, entered into a settlement agreement on February 6, 1980, with the tenants' asso-

**2.** Indeed, Daniel Singer, a partner in the firm of Fried, Frank, Harris, Shriver & Kampelman, chief legal counsel for Eureka, consistently expressed the view that the tenant claims were without merit.

**3.** Among the other alternatives discussed was that CTI issue outsale policies for phase I units up to the $9,000,000 face amount of the policy,

which would have left Eureka without Note II protection for its remaining interest in Carrollsburg Square. It was also proposed that Eureka hold all of the proceeds of condominium sales in escrow to indemnify CTI until the tenant claims could be resolved. As indicated, Eureka and CTI failed to reach agreement on these proposals.

ciation which was ratified by a large majority of the tenants. Eureka obtained a commitment from another title insurer to issue the necessary outsale policies. In accordance with the settlement agreement the major legal obstacles to conversion raised by the tenants were dropped. Thereafter, Eureka was able to close its sales of individual condominium units and to proceed with its sales efforts.

## II. LIABILITY

Clause 7(c) of the policy reads as follows:

No claim shall arise or be maintainable under this policy ... for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.

Despite its failure to obtain CTI's consent to the settlement Eureka argues that it is entitled to recover on the policy under either of two theories. First, Eureka argues that CTI's refusal to consent to the settlement with the tenants negotiated by Eureka was unreasonable and that, notwithstanding clause 7(c), an unreasonable refusal to settle by the insurer constitutes a breach of its duty to its insured. Alternatively, Eureka argues that it was free to settle without CTI's consent because CTI had previously breached the policy by denying liability for damages arising from delay of the project caused by the tenants' attempted enforcement of their rights.[4]

### A. *CTI Had No Duty To Settle*

■ Eureka's argument that CTI had a duty to accept the settlement Eureka had negotiated even though CTI believed the settlement was excessive and inconclusive can be resolved in short order. As stated by the Court in *Traders & General Ins. Co. v. Rudco Oil & Gas Co.*, 129 F.2d 621 (10th Cir. 1942):

It is well settled that if the potential loss is within the limits and coverage of the policy and the insurer accepts liability therefor, by agreeing to defend the claims or suits against its assured, and to pay the losses when established, the insurer is accorded the absolute control of the litigation. It may elect to compromise and settle the claims before suit is filed or after, or it may elect to defend in the name of the assured, and the exercise of its discretion is not subject to challenge by the assured. The assured may not do more than cooperate with the insurer in the defense of the claim or suit. *Id.* at 626.

*See also Fireman's Fund Ins. Co. v. Security Ins. Co.*, 72 N.J. 63, 367 A.2d 864, 870 (1976); 7C Appleman on Insurance § 4681 (1979). This limitation on the insured's right to settle where the potential recovery remains within policy limits is reasonable since, so long as the insurer acknowledges its liability, only the insurer's economic interest will be affected by the outcome of the litigation.

■ Eureka did not contend at trial and the evidence does not support the claim that Eureka's potential exposure exceeded the $9,000,000 coverage provided by the policy. Eureka's most extravagant claims of delay damages were in the range of several hundred thousand dollars per year and no attempt was made to estimate the size of Eureka's loss, if any, if the tenants were ultimately successful in establishing their claim that their section 602 rights had been violated. Thus, CTI was well within its rights under the policy in refusing to settle.

■ The numerous cases cited by Eureka for the proposition that an insurer has a duty, notwithstanding policy language similar to clause 7(c), to consider the interests of its insured in determining whether to settle are distinguishable. Obviously, where an insurer has received a settlement offer

---

4. Eureka also argues that even if Eureka's unauthorized settlement was not justified by CTI's prior breach, Eureka may still recover its delay damages since clause 7(c) releases CTI from liability, in the event of an unapproved settlement, only for liability "voluntarily assumed by an insured." Eureka points out that it did not voluntarily assume liability for delay damages and that in fact the settlement reduced this item of damage. In view of the Court's resolution of plaintiff's arguments that CTI was in breach it is unnecessary to consider whether clause 7 should be parsed in the manner suggested.

within policy limits but the potential liability is in excess of policy limits, the interests of the insurer and insured are in conflict. Thus the law imposes on the insurer "a duty ... to settle a claim against its insured within policy limits whenever there is a substantial likelihood of a recovery in excess of those limits." *Johansen v. California State Auto Assn. Inter-Insurance Bureau*, 15 Cal.3d 9, 123 Cal.Rptr. 288, 538 P.2d 744, 747 (Cal.1975); *see also Fireman's Fund Ins. Co. v. Security Ins. Co.*, 72 N.J. 63, 367 A.2d 864, 870 (N.J.1976); 40 A.L. R.2d 168 (1955 & 1980 Supp.). On the other hand, where no such conflict of interest arises, the law does not eliminate the insurer's absolute contractual right to control the litigation.

### B. CTI Denied Its Ultimate Liability Under the Policy

It remains to consider whether CTI breached the policy prior to settlement, justifying Eureka's decision to settle without CTI's consent. This requires a determination of the policy's coverage followed by a review of CTI's statements and actions once the claim for delay damages allegedly caused by the tenant action was presented.

#### 1. Scope of Coverage

■ The scope of policy coverage hinges on how Note II is reconciled with standard clause 7(b).[5] Two alternative interpretations of the policy's coverage were advanced over the course of the trial in an effort to effect this reconciliation. There is no dispute that "loss or damage" within the meaning of Note II encompassed consequential damages arising from delay in the condominium conversion caused by attempted enforcement of tenant 602 rights. Initially, CTI took the position that in the event of litigation of tenant claims the policy protected against "loss or damage" due to delay only if the tenants ultimately obtained a judgment in their favor. Eureka consistently maintained that the policy protects against such "loss or damage" whether or not the tenants' section 602 claims were eventually sustained by a court. On the third day of trial CTI appeared to change its position and acknowledged, in response to questioning by the Court, that the policy covers such "loss or damage" regardless of how the merits of the 602 claims were ultimately resolved.[6] The Court is confident that this interpretation fits the facts and the law.

Note II provided novel insurance coverage to deal with a special type of risk. As testified by Singer, counsel for Eureka who negotiated the policy, it was "a novel notion" to deal with the statutory rights of tenants affected by condominium conversions through the vehicle of a title insurance policy. Thus, no past experience or body of interpretation provides guidance.[7]

The circumstances at the time the policy was entered into support the interpretation that Note II provided protection against loss or damages due to delay regardless of how the tenant claims were finally resolved through litigation. The conversion of Carrollsburg Square apartments into condominiums was a highly leveraged real estate transaction which contemplated altering the legal form of title to the apartments in as short a time as possible. The financial success of the venture depended on avoiding any serious delays and any tenant challenge to Eureka's title in Carrollsburg Square could obviously lead to delay. Eure-

---

**5.** Clause 7(b) reads:

No claim shall arise or be maintainable under this policy ... in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title, as insured....

**6.** This position of counsel for CTI announced and thereafter espoused at trial constitutes a judicial admission and is conclusive on the factual question of the scope of coverage agreed to by the parties. *See* McCormick on Evidence,

§ 267 at 643–644 (1972); Wigmore on Evidence, § 2588 *et seq.* (1981).

**7.** The parties have stipulated that the phrase "enforcement or attempted enforcement" is not a term of art and is to be given its ordinary meaning. As the CTI underwriting manual acknowledges, however, the insured is entitled to the benefit of "the universal rule of construction that requires insurance policies to be interpreted in his favor and against the insurer." *See Keene Corp. v. Insurance Co. of North America*, 667 F.2d 1034, 1041 (D.C.Cir.1981).

ka obviously sought the special Note II coverage as the result of a prudent business decision. John Cooney, who signed the policy on behalf of CTI, was aware of the problem of tenant opposition to condominium conversions in the District of Columbia and that Eureka's purpose in acquiring Carrollsburg Square was promptly to convert and sell condominium units. Conscious that a risk of delay existed, he even sought legal advice as to the possibility of tenant action. Under these circumstances, it would be unreasonable to conclude that the parties intended that Eureka would be entirely unprotected for delay damages due to "enforcement or attempted enforcement" of tenant rights if the tenants should ultimately be unsuccessful in court.

It is plain from the language of Note II that it does not merely provide protection in the event the existence of section 602 rights is definitively established but rather protects against "loss and damage" from the risk that the tenants might assert or attempt to assert such rights. In contrast to Note II, other provisions of the policy only protect against losses due to the existence of adverse rights after trial, as for example, the provision insuring against loss or damage incurred by reason of "[a]ny defect in or lien or encumbrance" on title. The language of Note II is obviously broader in scope.

Thus Note II provides coverage for loss or damage regardless of whether a court ultimately determines that the claims are valid, as both parties now concede. However, under clause 7(b) CTI is apparently relieved of any liability when it successfully removes an adverse claim to title through litigation. Thus, a fundamental inconsistency is introduced into the policy by clause 7(b) since it apparently eliminates coverage specifically provided in Note II.

 While the coverage provided by an insurance policy must be interpreted in light of its stated conditions, standard exceptions to coverage must give way when, as here, they conflict with specific coverage negotiated by the parties. *See Employers Mut. Ins. Liability Co. v. Pacific Island Navigation Co.,* 358 F.2d 718, 719 (9th Cir. 1966); Couch on Insurance § 44:415 (1964 & 1980 Supp.). In attempting to discern the meaning of a policy the expectation of the parties is the primary guide. *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034, 1041–1042 & n.12 (D.C.Cir.1981). This approach is consistent with the general rules of contract interpretation that specific terms are to be given greater weight than general language and specifically negotiated language is to be given greater weight than standardized terms. Restatement (Second) of Contracts § 229 (Tent. Draft No. 5 1970). Since Eureka here specifically requested the coverage provided in Note II and the parties drafted this provision to cover a particular perceived risk, Note II obviously must take precedence over the general language of clause 7(b).[8] Thus there can be no doubt that the policy protected Eureka against loss or damage attributable to attempts to enforce tenants' section 602 rights and that CTI was liable for this amount regardless of how the tenants' claims were ultimately resolved.

### 2. CTI Wrongfully Denied Liability Prior to Settlement

 It is well established that if an insurer wrongfully denies liability when its

---

8. This interpretation, it should be noted, does not read clause 7 out of the contract. The general provisions of the policy which provide coverage against various more traditional title defects can be read harmoniously with clause 7. For example, the policy provides coverage against "loss or damage ... sustained or incurred by the insured by reason of ... [a]ny defect in or lien or encumbrance on such title." Reading this language together with clause 7, the policy precludes recovery by the insured where the insurer removes an alleged defect within a reasonable time or where the insurer ultimately vindicates title through the courts. Furthermore, clause 7 can be given partial effect and interpreted in a manner consistent with Note II by stating that under clause 7(a) CTI could avoid any liability for a loss in value of the property due to the tenant claims (as opposed to damages caused by attempted enforcement) by resolving the dispute within a reasonable period, and that under clause 7(b) CTI would not be liable to Eureka for any amount, including enforcement damages, until the litigation was finally resolved.

insured submits a claim, the insurer may be held liable for the costs of a reasonable settlement reached by the insured even if the insurance company has refused to consent to the settlement. *See Traders & General Ins. Co. v. Rudco Oil & Gas Co.*, 129 F.2d 621, 626 (10th Cir. 1942). *See generally* 67 A.L.R.2d 1086 (1959 & 1978 Supp.). As stated in *Franklin v. Oklahoma City Abstract & Title Co.*, 584 F.2d 964, 968 (10th Cir. 1978), "provisions prohibiting out-of-court settlements between an insured and a claimant without the consent of the insurer are not enforced when the insurer repudiates coverage or denies liability."

▮ An insurance company's actions may amount to a denial of liability if the insurer fails within a reasonable time to advise its insured as to its understanding of the scope of coverage where that understanding conflicts with the claim. In *Isadore Rosen & Sons, Inc. v. Security Mut. Ins. Co.*, 31 N.Y.2d 343, 339 N.Y.S.2d 97, 291 N.E.2d 380 (1972), the Court reversed summary judgment in favor of the insurer where there was evidence that insured was under severe pressure to settle the claim in order to obtain monies owed it and the insurer allegedly refused either to assert or deny coverage. The Court stated,

> the insurer's obligation to act in good faith for the insured's interests may be breached in other ways than by refusing or neglecting to defend a suit. It may be breached by neglect and failure to act protectively when the insured is com-

pelled to make settlement at his peril; and unreasonable delay by the insurer, in dealing with a claim, may be one form of refusing to perform which could justify settlement by the insured. *Id.* 339 N.Y. S.2d at 101, 291 N.E.2d at 382.

*See also Otteman v. Interstate Fire & Casualty Co.*, 172 Neb. 574, 111 N.W.2d 97, 102 (1961); 7C Appleman, Insurance Law and Practice § 4714 at 529 (1979).

▮ It is apparent from the facts cited below that CTI incorrectly denied liability it had assumed under the policy prior to Eureka's settlement.[9]

From the time the tenants initiated their legal actions through the fall of 1979, CTI consistently refused to take a firm position on whether the policy covered damages caused by tenant delay of the conversion. In the summer of 1979, after Eureka had submitted its claim, John Cooney stated to Singer that he did not believe that delay damages were covered by the policy and indicated that Singer should consult with Cooney's superiors in Chicago.[10] For reasons not explained at trial, CTI delayed six months, until November, 1979, before acknowledging Eureka's claim despite the fact that CTI's claims manual requires that a claim be acknowledged within 30 days of its receipt. In acknowledging the claim Cortellessa expressly reserved CTI's option to deny liability by stating that CTI "does not admit" liability for delay damages.

---

**9.** As a preliminary issue CTI argues that it cannot be charged with denying liability since Eureka never specifically asked CTI to pay delay damages. This contention is frivolous. CTI had no form which it required an insured to use in submitting a claim and thus so far as Eureka was aware informal communications were sufficient to put CTI on notice. On numerous occasions Singer and Astolfi, Eureka's manager, informed CTI of the type of delay damages they felt Eureka was suffering and in no instance did CTI complain to Eureka about the quality or quantity of information that it was receiving. Eureka had even opened its books and records for CTI's inspection. At trial Cortellessa testified as follows:

> Q. Now, so far as Mr. Singer was aware, at December 5, during that telephone conversation, would it be fair to say that based on

what you said to him that he could consider that CTI had his claim under consideration?
> A. Yes.
> Q. And he could consider that CTI had the claim for delay damages under consideration?
> A. Yes.

In addition, as discussed below, Eureka's delay damage claim was discussed at meetings in Chicago between representatives of Eureka and CTI held on January 11 and 21, 1980. Under the circumstances Eureka did more than enough to put CTI on notice of its delay claim.

**10.** Although Singer apparently had a conversation shortly afterwards with Mr. Memmer, a CTI official in Chicago, no evidence was presented as to the content of that discussion.

Towards the end of 1979 Eureka had been able to negotiate what it considered a reasonable settlement with the tenants and a meeting was arranged with CTI officials to discuss coverage under the policy. Two meetings were held in Chicago at CTI headquarters, one on January 11, 1981, and the second on January 21.

The witnesses sharply disagreed concerning the position CTI Vice President and General Claims Counsel, James Bayer, took at these meetings with respect to CTI's ultimate liability to Eureka if the dispute with the tenants were litigated through to a final conclusion. Singer testified that he specifically requested of Bayer what CTI's position on Eureka's claim would be, either in the event that the tenant claims were defeated or in the event the tenants prevailed. According to Singer, Bayer stated that while CTI would continue to pay all legal expenses it would not consider itself liable to Eureka for any loss or damage attributable to delay, regardless of whether CTI was successful or unsuccessful in vindicating title. Astolfi's recollection of this conversation was slightly different. Astolfi testified that Bayer said that CTI would not pay delay damages if it were successful in vindicating title within a reasonable time. However, he testified that Bayer said that CTI would "entertain" a claim by Eureka for delay damages if CTI could not vindicate title through the courts.

Bayer's recollection of what he said at these meetings contradicts those of Singer and Astolfi. He testified that he stated that CTI would consider itself liable up to the $9,000,000 face amount of the policy in the event that the tenants prevailed. Bayer testified that he stated that Eureka should submit a claim and CTI would "consider" it in the event that CTI was successful in defending against the tenants' claims.

Even if the credibility issue raised by this testimony is resolved in favor of CTI, Bayer's statement that he would "consider" Eureka's delay damage claim in the event the tenants were defeated was in effect an avoidance of liability. On cross-examination, Bayer admitted that this statement was not intended to provide any comfort to Eureka:

Q. If they had the damages that they said they had, is it your position that those damages were covered by Note II of the policy?

A. We told them at the January 11 meeting that we would consider their damages.

Q. What does that mean, consider their damages?

Does that mean you would think about it and tell them later or were you saying, We will pay them?

A. I think you do the same thing when you receive a bill from anybody. You consider whether the bill is correct, whether it is incorrect; and if it is correct, you pay it. If it is not correct, you go back to the person who sent you the bill and you say, You have made a mistake.

In view of CTI's already long delay in taking a firm position on its possible liability, and in view of Eureka's need to decide soon on the emerging settlement—a constraint of which CTI was well aware, Bayer's equivocal response was equivalent to a denial of liability.[11]

This course of conduct must be appraised in the light of CTI's position in a subsequent letter of February 4, 1980, from Memmer to Singer outlining CTI's final position on the imminent settlement with the tenants. Memmer reiterated CTI's refusal to issue outsale policies except upon the condition that it was released from all liability under Note II of the policy and its

---

11. CTI argues that it was entitled to remain vague about the extent of its liability since it was not obligated to make any payment to its insured until the tenant actions were resolved and the precise amount of Eureka's losses ascertained. However, Eureka did not request CTI to take a position on the extent of its liability but rather whether Eureka's delay damages, if proved, would be covered under the policy. This not so subtle distinction has significance. As the cases at page 12 indicate, a wrongful denial of coverage, even if made in good faith, constitutes a breach.

refusal to contribute to the costs of the settlement. In discussing the other alternatives open to Eureka, Memmer wrote:

> CTI is also of the opinion that "expansion" of the Superior Court action # _____ or, perhaps, a declaratory action in a court of competent jurisdiction would also resolve the matter fully and favorably to Eureka and within a reasonable period of time, in accordance with paragraph # 7 of the Conditions and Stipulations of the policy, albeit not as expeditiously as the settlement by Eureka. Under said paragraph 7, no claim shall arise ... under this policy (a) if the Company after having received notice..., removes such defect, ... as insured, within a reasonable time... (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title..., as insured, as provided in paragraph 3 of said policy.

As discussed above, clause 7(b) cannot be read as a limitation on Eureka's right to recover delay damages arising out of attempts to enforce tenants' rights. Thus, by attempting to rely on clause 7 as a limitation on its liability under Note II, CTI gave further indication that it was denying liability for a major item of coverage within the scope of the policy.

Further, in any event, the Court finds Bayer's testimony unpersuasive and accepts as more reliable the testimony of Singer and Astolfi that CTI denied delay damage liability in the event the tenants were unsuccessful in court. This finding is buttressed by CTI's position at trial. In its pretrial brief and through the opening days of trial counsel for CTI took the position that by virtue of clause 7(b) the policy did not cover Eureka's delay damages if the tenants were ultimately defeated. The reasonable inference is that CTI's original position advanced by the company's Chicago insurance attorney was consistent with that taken by CTI officials in their negotiations with Eureka, and that CTI only abandoned its position in an effort to catch what it thought might be an advantageous shift in the wind at trial.

## C. Eureka's Duty of Good Faith

Accepting for the sake of argument that its conduct may have amounted to a breach, CTI also argues that by concealing or misrepresenting certain key facts Eureka breached its duty to deal in good faith with its insurer and that this breach is an independent bar to recovery. According to CTI, Eureka exaggerated the costs of the settlement, improperly included certain costs in its demand for reimbursement for the cost of settlement, failed to inform CTI that other legal steps necessary to conversion were incomplete, and took inconsistent positions in dealings with CTI.

Eureka kept CTI continually informed of the actual cost of settlement as it gradually forced down the tenants' demands through the course of negotiations which culminated in February, 1980.

Certain discounts to tenants affixed as part of the settlement are arguably not attributable to the tenant actions since Eureka had stated it would offer such discounts before the tenants' opposition to conversion even arose. But, the tenants did in fact demand explicit assurance in the settlement agreement that these discounts would be offered. Eureka's claim in the heat of negotiations that these represented a cost of settlement does not amount to bad faith. More importantly, CTI's charge of bad faith is rebutted by the fact that Eureka made clear that it would be satisfied if CTI made only a contribution to the settlement.

Eureka did not fully inform CTI that some of the other legal steps necessary to a successful conversion were not complete in the fall of 1979. However, Eureka was not under a duty to keep its insurer fully informed about all aspects of its business. Insofar as Eureka may have overestimated its delay damages this is relevant to the validity of Eureka's damage claims and not to the question of liability.

Finally, there is no merit to the argument that CTI was misled by Eureka's counsel since on the one hand Singer took the position that the tenant claims were without merit and on the other urged CTI to accept

an expensive settlement. Singer was sufficiently uncertain of the outcome of the litigation that he expressly refused to guarantee to CTI what the outcome would be. In view of the uncertainties and mounting losses Eureka faced if litigation was protracted unduly, the settlement figure advocated by Eureka was not grossly unreasonable in relation to the merits of the tenant claims.

\* \* \*

■ The tenant section 602 rights were seriously and persistently advanced. This made the title unmarketable and stymied the condominium conversion project. Eureka had specifically sought and obtained explicit insurance coverage against this risk and was entitled to recover its losses caused by the continuing attempted enforcement of tenant rights up to the $9,000,000 limit of the policy. Once it became clear that the tenant actions could not be resolved quickly in the courts settlement of the tenant claims was the obvious sensible solution to this serious business problem. CTI refused to consent to the settlement and to contribute to the payment to the tenants. It chose to have the dispute with the tenants litigated and at the same time denied any ultimate liability to pay consequential damages when the litigation terminated. This was in effect and in fact a repudiation of its obligations under the policy and constituted a breach providing Eureka the legal right to settle without CTI's consent. Eureka is therefore entitled to damages.

### III. DAMAGES

Eureka's damage claims fall into three categories: the costs of the settlement with the tenants; legal fees incurred by Eureka not reimbursed by CTI; and various costs allegedly incurred as a result of delay in the conversion schedule due to tenants' efforts to enforce their section 602 rights.

#### A. Costs of the Settlement

■ Since CTI wrongfully denied liability under the policy Eureka may recover the costs of the settlement with the tenants despite its failure to obtain CTI's consent provided the settlement was reasonable. See Traders & General Ins. Co. v. Rudco Oil & Gas Co., 129 F.2d 621, 626 (10th Cir. 1942); 7C Appleman on Insurance § 4690 at 229 (1979). In assessing the reasonableness of the settlement the Court must consider that Eureka was "cut loose" by its insurer and that rapid accomplishment of settlement was essential to avoid incurring potentially substantial delay damages. Thus, Eureka's settlement with the tenants has "a presumption of being reasonable." Id. at 231–32. While the amount paid to the tenants in settlement of their section 602 claims was, in general, reasonable and appropriate, several objections to particular· items included in Eureka's claim for the cost of settlement must be considered.

The major item is the cash payments paid to individual tenants. Tenants who on January 31, 1979, occupied units converted during phase I and who received notices to quit were entitled to receive $3,000 per apartment. Other tenants in phase I units were entitled to receive $1,000 per apartment. Eureka seeks recovery of $200,500, the sum of the payments tenants were eligible to receive under the settlement agreement.[12] CTI does not dispute the accuracy of this figure.

■ The parties, however, do dispute whether Eureka's claim for $200,500 should be reduced by the $16,218 in unpaid rent which Eureka subtracted from the individual payments to tenants as permitted by the settlement agreement. It is obvious that it would have been very difficult for Eureka to recover back rent due from individual tenants except through deductions from tenant payments and any effort to do so risked inciting further tenant opposition. Accordingly, it is inappropriate for Eureka, for the purpose of calculating its damages, to assume that the $184,282 actually paid to the tenants is functionally equivalent to a

---

12. This figure includes the $1,500 cost of maintaining the escrow account out of which tenant payments were made.

payment of $200,500 by Eureka and a separate payment by the tenants of $16,218. Eureka never agreed to pay a total of $200,-500; it agreed to pay this amount *minus* the recouped rent. Eureka is only entitled to $184,282, the sum of payments actually made to the tenants under the settlement agreement.

Plaintiff also seeks recovery of payments that it may be obligated to make to tenants occupying units in phases II and III of Carrollsburg Square. If additional rental units are converted to condominiums and Eureka becomes obligated under the settlement agreement to make payments to these tenants, CTI will be required to reimburse Eureka for these payments as well.

The second element of the claim for the costs of settlement is $90,000 in legal fees and expenses incurred by the tenant association which Eureka is required to pay pursuant to the terms of the settlement agreement. As indicated by plaintiff's exhibit 125, three installments totalling $52,500 have actually been paid. CTI does not dispute the accuracy of this figure and Eureka is therefore entitled to receive $52,500.

Eureka also seeks recovery of the remaining two installments, totalling $37,500, one-half to be paid upon completion of phase II of the conversion and the other half to be paid upon completion of phase III. CTI objects that Eureka's liability for this amount is speculative since there is no evidence that Eureka will proceed with phases II and III. Eureka will be permitted to recover these remaining two installments if and when phases II and III of the Carrollsburg Square conversion are carried out.

■ The third element of the costs of settlement is the $8,115 paid to Banca Della Suizera Italiana to secure a $700,000 letter of credit which Eureka was required to obtain as a guarantee that it would perform its obligations under the settlement agreement. There is no support in the record for CTI's suggestion that this figure is suspect since it was not arrived at through an arm's length transaction. Eureka will be awarded $8,115.

The final element of the claim for settlement costs is the estimated cost of offering long-term leases to elderly and infirm tenants as required by the settlement agreement. Eureka agreed to make available "up to" 15 units in phases I, II, or III for rental by eligible tenants. Eureka claims $82,650 on the assumptions that it will be required to enter into 15 leases and that in order to sell units subject to these leases it will be required to offer a ten percent discount on the sales price.

■ This claim for damage is too speculative. First, Eureka did not actually enter into any such leases in converting phase I, and, assuming that units in phases II and III are converted, there is no evidence that there are eligible tenants occupying these units who are likely to request long-term leases. Second, in exchange for obtaining a long-term lease a tenant must give up all or part of his or her settlement payment; this is likely to deter eligible tenants, if any, from accepting long-term leases. Third, there is no evidence in the record to support Eureka's assumption that units subject to long-term leases could only be sold at a ten percent discount. Finally, as Eureka acknowledges, in its first open meeting with tenants in May, 1979, Eureka announced that it would be offering rent-controlled units to the elderly and the handicapped. Although Eureka never specified prior to the settlement the terms on which such leases would be offered, Eureka's earlier representations support the inference that Eureka did not incur this obligation as a result of the tenant actions.

Eureka's demand for $82,650 in damages covering this aspect of the settlement must be rejected.

### B. *Attorneys Fees*

■ Eureka claims $67,656.38 in legal fees it paid to Fried, Frank for services rendered after February 4, 1980, when Fried, Frank informed CTI that it could no longer represent both CTI and Eureka and that CTI should no longer pay its fees. In view of CTI's breach of its obligations under the policy, CTI may be held liable for the costs, if proven, of services performed

by independent counsel in connection with Eureka's efforts to resolve the tenants' challenge to title. *See Transamerica Ins. Co. v. Keown*, 451 F.Supp. 397 (D.N.J.1978).

In support of this claim Eureka relies on Fried, Frank's unitemized bills which simply state that the work related to tenant 602 claims. This is insufficient evidence to support an award for these fees. Daniel Singer, Eureka's principal legal adviser at Fried, Frank, testified at length at the trial but he provided no detailed information supporting these invoices. The agreement with the tenants was signed on February 5, 1980, and the record does not suggest that Fried, Frank performed much work in connection with the settlement thereafter. The bulk of the services performed for Eureka by Fried, Frank after February 4, 1980, related to obtaining various governmental approvals that would have been required even in the absence of the tenant actions. Eureka presented no evidence that these services were paid for separately, or, if not, what portion of the $67,656.38 represented fees for these services. One of the invoices is for work apparently performed between May 1 and August 5, 1980. Since the dispute with the tenants had long been resolved by that time and sales to purchasers had begun, it is implausible that Fried, Frank performed any services during this period relating to tenants' efforts to enforce section 602.

Since Eureka has presented insufficient evidence in support of its claim for unreimbursed attorneys' fees its demand for $67,656.38 must be rejected.

## C. *Delay Damages*

Eureka seeks $1,323,178.80 in additional costs which it claims it incurred as a direct result of delay in the conversion schedule due to the tenants' efforts to assert section 602. Closings on individual condominium units did not commence until March 23, 1980, and as of the date of trial Eureka still had not sold all of the units in phase I. Eureka's calculation of its delay damages is based on the assumption that in the absence of the tenant actions closings on units in phase I would have commenced on November 1, 1979, and that all units would have been sold by the end of March, 1980.

Neither of these two assumptions is supported by the evidence.

### 1. *The November 1, 1979 Target for Commencement of Closings.*

Eureka claims that it had to delay the commencement of closings four months and twenty-three days because of the tenant actions and that this delay forced Eureka to make its primary sales efforts in a more unfavorable market with the result that fewer units were sold than would have been the case if closings had commenced November 1.

The most striking difficulty with this claim is that the weight of the evidence establishes that Eureka never in fact planned to commence closings on November 1. While Astolfi testified that he planned to commence closings on phase I units in November, 1979, and Mayhood, Eureka's project sales manager, testified to conversations with Astolfi in which that date was mentioned, this testimony is completely rebutted by the fact that contemporaneous planning documents prepared by Eureka or its associates indicated a later date for the commencement of closings. In a planning budget he prepared in April, 1979, Astolfi indicated that closings would not commence until January, 1980. A June, 1979, budget model prepared for Eureka by Community Management Services also states that conversion was scheduled to begin in January, 1980. These estimates are confirmed by Mayhood's timetable of the projected closings which indicated that closings would begin five months after the commencement of sales. Assuming that Eureka's claim that it planned to begin sales in September, 1979, is correct, Mayhood's projection places the first closings in early 1980.

This documentary evidence is supported by statements of various participants in planning the conversion of Carrollsburg Square. For example, in November, 1979, Singer told representatives of CTI that

Eureka had originally planned to close on units beginning "in late 1979 early 1980."

In the face of this evidence Eureka argues weakly that these were extremely conservative estimates, some of which were intended for presentation to various lending institutions, and that they should therefore be ignored by the Court. In the absence of any convincing evidence supporting the November 1 starting date, the Court is obliged to hold Eureka to the later dates which, in its business judgment, Eureka was willing to commit to paper and share with others at the time.

Assuming that Eureka's contemporaneous planning documents reveal the actual anticipated date for commencement of closings, even these dates appear to have been overoptimistic. The conversion of Carrollsburg Square was an extremely complex real estate transaction requiring the involvement of numerous parties both public and private. Eureka had very little experience in real estate development and Carrollsburg Square was located in a relatively untested market for condominium conversion. Nevertheless, Eureka set an extremely aggressive schedule for the conversion.

Rozansky & Kay, an experienced real estate developer in the District of Columbia, purchased the original contract to buy the Carrollsburg Square leasehold and in July, 1978, prepared a timetable for converting the apartments to condominiums over a three-year period starting on January 1, 1979. By contrast, Astolfi's April, 1979, budget, prepared shortly after Eureka had purchased the leasehold, projected that the conversion would be completed in less than two years. Although Astolfi relied heavily on the earlier Rozansky & Kay planning documents in other respects he nevertheless shortened their schedule by almost one-half. Whereas Rozansky & Kay had planned to sell 167 units in all of 1979, Astolfi projected that Eureka could sell 128 units in the final four months of 1979. Also, despite the fact that Eureka's plans called for sales to

begin eight months later, Astolfi projected that by July, 1980, Eureka could sell sixty more units than Rozansky & Kay projected they could sell by that date.[13]

The overoptimism of Eureka's projections is also reflected in the fact that Eureka had already fallen behind its projections well before the Rental Accommodations Commission issued its injunction. For example, Eureka planned as of April, 1979, to commence sales to tenants on May 1, 1979. Sales did not actually commence until the end of May. In addition, although Eureka planned to let a contract for the rehabilitation of certain units for office space and model units in May, 1979, this contract was not let until August.

Finally, even in the absence of tenant actions, Eureka would not have been able to commence closings until March, 1980, since it lacked a number of essential approvals from the District of Columbia, various federal agencies, as well as several private institutions.

In order to proceed with the conversion it was necessary for Eureka to obtain the fee title to Carrollsburg Square and obtain agreement to its plan for staged release of the existing mortgage on the property as each phase of the conversion commenced.

In April, 1979, Eureka applied to the D. C. Redevelopment Land Agency ("RLA") for authorization to purchase the fee to Carrollsburg Square pursuant to its option agreement. Although Eureka's representatives regarded this authorization as a ministerial step the RLA delayed approval of the authorization, primarily due to debate within the RLA board over the proper purchase price. At one point in the summer of 1979, Eureka even threatened to sue the RLA for its failure to act on the authorization. The RLA board did not provide authorization until August 15, 1979.

On August 27, 1979, Eureka instructed its counsel, Fried, Frank, that they should proceed expeditiously to acquire the fee in

---

**13.** In October and December of 1979, Eureka raised the sales prices on condominium units above those projected in Astolfi's April, 1979,

budget. This increase is likely to have depressed sales, making Astolfi's projected sales pace even more unrealistic.

**1126**

order to demonstrate to the tenants Eureka's determination to complete the conversion. A necessary precondition for acquisition of the fee, in addition to the authorization of the RLA, was to obtain the agreement of the Philadelphia Savings Fund Society ("PSFS") to the "spreader agreement" under which PSFS' existing mortgage interest in the leasehold was to be replaced by a security interest in the fee. PSFS, in turn, required the approval of its title insurer, Columbia Title, before it would accept the spreader agreement. Columbia Title did not grant its consent until January 24, 1980. The fee to Carrollsburg Square was then purchased on February 1, 1980.

Two approvals needed to be obtained from the United States Department of Housing and Urban Development ("HUD") before conversion could proceed. The first was HUD's approval of Eureka's purchase of the leasehold interest in Carrollsburg Square, the so-called Final Approval for the Transfer of Physical Assets. Second, Eureka required HUD's approval of its plan to release the PSFS mortgage in stages as each phase of the conversion was carried out. Preliminary approvals for both of these items were received from HUD in late 1978 and early 1979.

Eureka filed its application for Final Approval of the Transfer of Physical Assets on May 15, 1979. Eureka's request was initially denied since it failed to provide HUD with all of the necessary documentation. Throughout the fall of 1979, Fried, Frank continuously negotiated with HUD officials in an effort to obtain final approval. At least in part, the delay was attributable to HUD's policy to use any available discretionary authority to thwart condominium conversions where the tenants objected. HUD finally granted its approval on January 7, 1980.

After receiving approval of the transfer of physical assets Eureka began to press its request for final approval of its plan for phased release of the security. After it appeared that HUD would undertake a lengthy underwriting review before granting approval Eureka agreed to provide HUD with a $9,000,000 letter of credit to avoid this step in the approval process. HUD did not issue its final approval until March 21, 1980.

Finally, Eureka was also required to obtain approval from the District of Columbia and HUD for the Easement and Expense Allocation Covenant before it could proceed with the conversion. The District of Columbia and HUD did not give their approvals until March 20, 1980, and March 21, respectively.

In order to defuse the force of this evidence, Eureka argues that because of the tenant actions it intentionally slowed down its efforts to obtain approvals which either required financial expenditures, such as the fee acquisition, or which provided the tenants additional forums in which to press their section 602 claims, such as the matters pending with HUD. Thus, Eureka argues, its failure to obtain these approvals was not an independent source of delay barring its claim for delay damages. The evidence does not support this argument. As discussed, Fried, Frank, on behalf of Eureka, vigorously pressed its request for authorization to purchase the fee from RLA and later, on instructions from Astolfi, Fried, Frank actively sought Columbia Title's consent to the "spreader agreement." Through the fall of 1979, Fried, Frank engaged in continuous negotiations with HUD in order to obtain the Final Approval of the Transfer of Physical Assets. As a matter of strategy in dealing with HUD, Eureka intentionally deferred pressing for approval of phased release of the mortgage until it obtained approval of the transfer of physical assets. Thus there is no merit to Eureka's suggestion that these various necessary approvals were not in place as of November 1, 1979, because Eureka had intentionally postponed obtaining them.

As Eureka points out, many of these governmental agencies were generally aware of the tenants' actions and at least some of these approvals were arguably withheld to aid the tenants' cause. However, none of these agencies had authority to enforce section 602 and Eureka does not argue that

delay on the part of these agencies was a risk covered by the policy. Eureka obtained title insurance protecting against the assertion of specific statutory rights. It did not obtain general business insurance protecting against all legal obstacles to successful conversion.

In summary, Eureka has failed to carry its burden of demonstrating the delay claimed in its schedule for deeding out units as a result of the tenant actions. Viewed most favorably to Eureka, the evidence shows that Eureka never in fact planned to commence closings as early as November 1. Moreover, after entering into a settlement agreement with the tenants it took an additional one and one-half months for Eureka to obtain the various approvals necessary for conversion to proceed. Thus delay in the commencement of closings is attributable in substantial part to obstacles unrelated to the tenants' efforts to enforce section 602.

### 2. *The Five-Month Sell Out Schedule.*

As of the date of trial—over fifteen months after Eureka had allegedly planned to complete closings—Eureka still had not sold all of the units in phase I. Eureka nonetheless contends that its early projections of a five-month sellout should be accepted by the Court in measuring the amount of delay caused by the tenant actions. It is clear, however, that Eureka's projections were seriously flawed.

From the first it was obvious that Eureka would have difficulty selling its two-bedroom units.[14] During the initial spate of closings in March, Eureka sold only four two-bedroom units. From April, 1980, until June, 1981, Eureka did not sell even one two-bedroom unit. After recognizing the unpopularity of these units Eureka reconstructed twelve two-bedroom units and converted these into one-bedroom units. Nevertheless, while at the time of trial Eureka had sold all of the efficiency and one-bedroom units it still had on hand nine two-bedroom units.

There was low market demand for this size unit, at least at the price at which they were being offered. Weekly reports of Carrollsburg Square salespersons indicate the condominium fees on two-bedroom units were too high. Moreover, the presence of numerous less expensive units intermingled in the building with the two-bedroom units apparently deterred prospective purchasers of the more expensive units.

Eureka argues that the failure of the two-bedroom units to sell after March, 1980, does not necessarily indicate what the sales results would have been if two-bedroom units had been deeded out commencing November 1 since interest rates were higher in the later period. This ignores the fact that Eureka secured the agreement of various financial institutions to offer below market financing through June 30, 1981. Moreover, two-bedroom units sold at a significantly slower rate than other units even during March, 1980, when Eureka claims that it had the most advantageous financing. The fact that available mortgage financing was slightly higher after April 1, 1980, is insufficient to explain Eureka's lack of success in selling two-bedroom units at the pace it had anticipated.

In addition, there is strong evidence that Eureka's plans to sell out all units in five months was little more than guesswork. Although condominium conversions had been attempted in the Southwest area of the District of Columbia prior to Carrollsburg Square, this neighborhood remained a relatively untested market compared with the Dupont Circle area and other neighborhoods in the city. Eureka's timetable for closings must be considered in light of the evident uncertainties with which Eureka was confronted.

Eureka's own planning documents reflect its concerns that the neighborhood of Carrollsburg Square had a generally poor reputation and that this might deter prospective purchasers. Eureka recognized the need to create its own market by attracting rela-

---

14. Two-bedroom units represented 25 percent of all of the units in phase I and 40 percent of total value of phase I units based on actual sales prices.

tively affluent condominium purchasers from other areas of the city. Eureka's actual sales experience, especially in the case of two-bedroom units, indicates that it did not successfully overcome these recognized problems.

### 3. Eureka's Delay Damage Claims

Eureka seeks recovery of the following under the rubric of delay damages:

1. $315,816.39 in financial carrying charges incurred from November 1, 1979 through March 23, 1980.
2. $128,135.37 in losses from operating phase I units as rental property from November 1, 1979, through March 23, 1980.
3. $330,027.00 in increased costs of carrying unsold units as a result of prolongation of the sell-out period.
4. $330,866.52 in increased costs of maintaining commitments from financial institutions to provide mortgages to individual condominium purchasers, from April 1, 1980, through June 30, 1981.
5. $181,895.07 in increased advertising costs incurred from February 1, 1980, through May 31, 1981.
6. $8,937.65 in increased costs of operating the Carrollsburg Square sales office from February 1, 1980, through April 30, 1981.
7. $27,500.80 for increased D.C. transfer tax paid on units sold or to be sold after August 1, 1980.

Each of these claims rests primarily on either or both of the assumptions discussed above. The claims for financial carrying charges and losses on rental operations are based on the assumption that the commencement of closings was delayed from November 1, 1979, to March 23, 1980, and that Eureka is entitled to recover expenses incurred during this period. Eureka's claim for the increased cost of carrying unsold units relies on the assumption that the period of closings was extended by delay in the commencement of closings and that Eureka is entitled to the difference between carry-

ing costs assuming a five-month period of closings and Eureka's actual carrying costs. The remainder of the damage items—the increase in the cost of maintaining end loan commitments, increased advertising costs, increased costs to operate the sales office, and increase in the D.C. transfer tax—rests on both of these assumptions. For example, if closings had commenced earlier, as Eureka claims it had planned, it presumably would not have incurred such heavy expenses after February 1 for maintaining and attempting to sell its remaining inventory. In addition, these items reflect costs incurred through June, 1981, on the theory that but for the tenants' actions phase I would have been closed out within five months.

Since neither of the key assumptions which provide the basis for Eureka's calculation of its delay damages is correct, Eureka's calculations must be rejected.

### 4. Eureka's Entitlement to Delay Damages.

Despite Eureka's failure of proof on its theory of damages, it is evident to the Court that the tenant actions damaged Eureka prior to settlement and indeed must have played some part in delaying the conversion of Carrollsburg Square. While much of the claim remains speculative the Court finds that Eureka suffered financial loss as a result of the tenant actions. Since Eureka has established this injury in certain particulars with reasonable certainty, any uncertainty in establishing the precise amount of this damage must be resolved in favor of Eureka.

Where the wrongdoing is "of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable

inference, although the result be only approximate." *Bangor & A. R. R. v. Brotherhood of Locomotive Firemen & Enginemen,* 442 F.2d 812, 822 (D.C.Cir.1971) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 [51 S.Ct. 248, 250, 75 L.Ed. 544] (1931). *See also Eccher v. Small Business Admin.,* 643 F.2d 1388, 1392 (10th Cir. 1981).

Eureka's efforts to sell condominium units were undeniably hampered by the tenants' actions. Eureka planned to commence sales to the public in September, 1979, and no evidence was adduced indicating that this projection was unreasonable.[15] But, as a result of the Rental Accommodation Commission injunction, entered in August, 1979, Shannon and Luchs, Eureka's exclusive sales agent, refused to commence condominium sales as planned based on advice of counsel. Sales did not commence until early November after Eureka agreed to indemnify Shannon and Luchs for any liability arising from its sales activity. Even then, however, sales were hampered by the tenant actions. Since Eureka did not know when the dispute with the tenants would be resolved it could not tell prospective purchasers when closings would begin or what type of financing would be available at that time. This uncertainty was not resolved until February, 1980, when the settlement agreement with the tenants was finalized. As a result of these obstacles Eureka lost some potential sales and had to continue its sales effort longer than anticipated and in a less favorable market.

In addition, but to an extent that is much less subject to quantification, the tenant actions caused Eureka injury by diverting time and energy from all of the other work that had to be accomplished to make the conversion a success. The large documentary record in this case indicates that hundreds of hours must have been consumed in attempting to prevail over the tenants and later in working out a settlement. As a matter of common sense it is obvious that if this effort had been expended in other ways the conversion would have been more successful. This conclusion militates in favor of a limited effort to assign some of the loss Eureka suffered to the wrongdoer in this case.[16]

■ The plaintiff has not presented and the Court is unaware of any data in the record that would permit a precise determination of the loss suffered by Eureka. Given the nature of the Carrollsburg Square conversion, loss due to the factors discussed above simply cannot be reduced to an amount certain. As indicated, the burden of this uncertainty must be placed in some measure on CTI. As trier of fact viewing the record as a whole the Court awards damages in the amount of $100,000, as representing a reasonable award for the injuries outlined above.

## IV. EUREKA IS NOT ENTITLED TO AN AWARD OF ATTORNEYS' FEES

■ Given the narrowness of the American rule with respect to the allowance of attorneys' fees, *see Alyeska Pipeline Service Co. v. Wilderness Soc.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), Eureka is not entitled to an award of attorneys' fees in this case. CTI did not act in egregious bad faith justifying such an award, as Eureka suggests. Rather, CTI's actions reflect bureaucratic lethargy and an inability to recognize promptly that its representative Cooney had provided Eureka with coverage for a novel and substantial risk. Moreover, CTI's contention in this lawsuit that it had fully met its obligation to its insured,

---

**15.** Sales could proceed even though all of the legal prerequisites for conversion were not in place; closings could not.

**16.** CTI contends that due to delay in the conversion schedule Eureka was able to charge higher prices for condominiums when sales finally commenced and that this benefit should be offset against Eureka's losses. The price list upon which CTI relies was prepared by Astolfi in April, 1979. Since this price list was prepared well in advance of the planned sales opening it is reasonable to assume that Eureka would have raised prices when sales commenced even absent the tenant claims. CTI's contention that all or even part of this price increase is attributable to delay caused by the tenant actions is not supported by the evidence.

though clearly not supported by the evidence, was not patently frivolous. *See National Assn. of Letter Carriers v. United States Postal Service,* 590 F.2d 1171, 1177 (D.C.Cir.1978). Accordingly, Eureka's request for an award of attorneys' fees must be denied.

Civil Action No. 80–2021 is dismissed and Eureka is awarded immediate damages in the amount of $344,897, plus costs to be fixed by the Clerk of Court, with interest from the date of judgment, in Civil Action No. 80–1014 in accordance with these Findings of Fact and Conclusions of Law.

SO ORDERED.