EUREKA INVESTMENT
CORPORATION, N.V.

v.

CHICAGO TITLE INSURANCE
COMPANY, Appellant.

CHICAGO TITLE INSURANCE
COMPANY, Appellant,

v.

EUREKA INVESTMENT
CORPORATION, N.V.

EUREKA INVESTMENT CORPORA-
TION, N.V., Appellant

v.

CHICAGO TITLE INSURANCE
COMPANY.

Nos. 82–1156, 82–1157 and 82–1201.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1982.

Decided Sept. 14, 1984.

---

(Civil Action Nos. 80–01014, 80–02021).

Roger E. Warin, Washington, D.C., with whom Alice L. Mattice, Washington, D.C., and Colleen P. Mahoney, Dallas, Tex., were on the brief, for appellant in 82–1156 and 82–1157, and cross appellee in 82–1201.

Michael C. Miller, Washington, D.C., also entered an appearance for appellant in 82–1156 and 82–1157 and cross appellee in 82–1201.

Stephen M. Sacks, Washington, D.C., with whom Lawrence V. Stein and Daniel I. Prywes, Washington, D.C., were on the brief, for appellee in 82–1156 and 82–1157 and cross appellant in 82–1201.

Before BORK and SCALIA, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion PER CURIAM.

PER CURIAM:

This appeal arises out of consolidated diversity actions involving a dispute over contractual rights and obligations under a title insurance policy issued in February, 1979 by Chicago Title Insurance Company ("CTI"), a Missouri Corporation, to Eureka Investment Corporation, N.V. ("Eureka"), a Netherlands Antilles Corporation, to insure certain real property in the District of Columbia known as Carrollsburg Square. This court has jurisdiction pursuant to 28 U.S.C. § 1391 (1982).

## I. BACKGROUND

On April 30, 1979, Eureka announced its intention to convert into condominiums one of the large buildings in Carrollsburg Square. Eureka's efforts met with opposition from tenants relying on the protections granted by Section 602 of the Rental Housing Act of 1977 (District of Columbia Law 2–54). Eureka's policy with CTI contained a special Note II which provided:

> The policy insures against loss or damage arising out of an enforcement or attempted enforcement of the rights, if any, of Tenants in the property pursuant to the provisions of Section 602 of the Rental Housing Act of 1977 (District of Columbia Law 2–54) or the Emergency Multi-Family Rental Housing Purchase Act of 1979, as the same may be amended.

On May 9, 1979 the tenants asked the District of Columbia Rent Administrator to conduct an investigation to determine whether their § 602 rights had been violated. The Rent Administrator dismissed the tenants' petition, but on August 14, 1979, the D.C. Rental Accommodations Commission reversed the Administrator's decision in part and enjoined Eureka from proceeding with the conversion. Because of that injunction, Eureka's exclusive sales agent, Shannon and Luchs, refused to commence sales as planned. Sales did not begin until early November, after Eureka agreed to indemnify Shannon and Luchs for any liability arising from its sales activities.

The Rental Accommodations Commission injunction remained in effect until January 4, 1980. In addition, during the fall of 1979 the tenants brought suit in the Superior Court of the District of Columbia to enjoin the conversion; and on December 27, 1979 the D.C. Department of Housing and Community Development sent a letter to Eureka threatening to issue a cease and desist order.

Eureka opposed the tenants' actions and kept CTI informed about all developments as they occurred. CTI promptly agreed that the tenant actions were within the risks covered by Note II and agreed to pay all of Eureka's legal expenses in opposing the tenants. Eureka began settlement negotiations with the tenants in the fall of 1979. During January and early February 1980, representatives of Eureka had several meetings with CTI officials, but reached no agreement on settlement terms the insurer could approve.

Eureka entered a settlement agreement without CTI's consent on February 6, 1980. This agreement eliminated the major obstacles arising from the tenants' actions under § 602. Eureka was not able, however, to begin closing on condominium sales until March 21, 1980 because it lacked necessary permissions from District of Columbia and federal officials and from certain private entities.

At trial, Eureka claimed the cost of its settlement with the tenants, delay damages, and attorney's fees. The court found that CTI was liable under the policy despite Eureka's unilateral settlement with the tenants. It awarded Eureka the full cost of the settlement and $100,000 in delay damages, but rejected Eureka's claim for attorney's fees. In this appeal, CTI contends that the trial court erred (1) in finding that Eureka's unilateral settlement with the tenants was justified by CTI's wrongful refusal to admit liability for delay damages; (2) in denying discovery of certain documents which CTI contends would show that Eureka breached the duty of cooperation it owed CTI under the policy; and (3) in awarding delay damages that were unjustified by the evidence. Eureka on cross-ap-

peal urges us to award attorney's fees that were denied by the district court.

We affirm the trial court's finding of liability and its award of settlement costs for the reasons given in its opinion. For the reasons given below, we sustain the district court's ruling on the discovery issue; we reverse in part the award of delay damages and remand for a new determination of their amount; and finally, we sustain the refusal to award Eureka attorney's fees incurred in its action against CTI but remand to assess the attorney's fees Eureka incurred in reaching a settlement with the tenants.

## II. THE DISCOVERY ISSUE

CTI has argued throughout this litigation that it is excused from any breach of its insurance policy with Eureka because Eureka breached the duty of cooperation it owed CTI under the policy. CTI contends that Eureka breached this duty by planning legal action against CTI with Daniel Singer and his firm, Fried, Frank, Harris, Shriver, & Kampelman ("Fried, Frank"), who at the time were counsel to both CTI and Eureka in their common interest in defeating tenant claims. To gather support for this claim, CTI sought discovery from Eureka of documents relating to Eureka's consultation with Fried, Frank about legal action against CTI. Upon Eureka's resistance on grounds of attorney-client privilege, the district court ordered the disclosure only of those documents that related to the tenant dispute or were prepared with a view toward litigation with the tenants, in effect upholding Eureka's claim of privilege. The district court found after trial that CTI had failed to establish Eureka's alleged non-

cooperation. CTI now contends that the denial of discovery was in error (and prejudicial) insofar as it prevented disclosure to CTI of seven documents regarding (to the extent withheld) Eureka's possible claims against CTI: four memoranda to Mr. Singer from other Fried, Frank attorneys; two telexes from Mr. Singer to a Eureka official; and notes by Mr. Singer.

■ CTI concedes that, in preparing the documents, "Eureka and Fried Frank were acting against CTI's interest."[1] This concession confirms Eureka's statement that, although Fried, Frank "represented CTI and Eureka *jointly* with respect to the defense of the tenant ... actions," it "represented Eureka *individually* with respect to the conversion generally and Eureka's rights *vis-a-vis* CTI."[2] Against the background of Fried, Frank's longstanding representation of Eureka in all aspects of the condominium conversion, including the negotiation of the insurance policy, there can be no doubt that Eureka and Mr. Singer thought they had an attorney-client relationship in which communications were privileged from CTI to the extent those communications concerned possible legal action against CTI. For the following reasons, this conclusion justifies Eureka's invocation of the attorney-client privilege.

CTI and Eureka agree that Wigmore's treatise states the relevant law of attorney-client privilege.[3] This case falls at the intersection of two principles stated by Wigmore. First, "a communication by A to X as the common attorney of A and B, who afterwards become party opponents, is not privileged as between A and B since there

---

1. Brief for Appellant at 48 (footnote omitted).

2. Brief for Appellee and Cross-Appellant at 49.

3. *See* 8 J. WIGMORE, EVIDENCE § 2312 at 603–09 (McNaughton rev. ed. 1961). Jurisdiction in this case being based on diversity, state law supplies the rule of decision on the issue of privilege. The applicable law is that of the District of Columbia, which is not only the forum but also the place where all events of significance to the claim of privilege, and indeed to the litigation, occurred: the law firm was and is in the District, the documents are in the District, the insurance policy was issued in

the District, and all events covered by the policy took place in the District. As the District of Columbia has no law specifically addressed to the issue presented here, and as District of Columbia courts, like most courts, draw freely from other jurisdictions' decisional law, as well as from Wigmore, in developing the law of attorney-client privilege, *e.g., Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 551 (D.C.1981), it is reasonable to rely on Wigmore in deciding whether Eureka has a privilege under District of Columbia law.

was no secrecy between them at the time of communication."[4] Second,

> [a] communication by A to X as A's attorney, X being then also the attorney of B, now become the party opponent, is ordinarily privileged because of the relation of X toward A. Nor does the fact of A's knowledge that X is already B's attorney, nor the fact of B's being already adversely interested destroy the privilege. This is so because, although X ought not to undertake to act for both in any matter where there is a possibility of adverse interests, nonetheless A is protected by reason of the relation.[5]

Evidently in contemplation of the situation presented here (the matter on which X represents B being a matter of common interest to A and B as joint clients of X), Wigmore points out that, "[i]n practice, difficulty often will arise here in distinguishing this situation from that of" the first principle.[6]

CTI contends that this case falls under Wigmore's first principle, which can be found as well in C. McCormick, Handbook of the Law of Evidence 219–20 (3d ed. 1984) and in many cases, *e.g., Truck Insurance Exchange v. St. Paul Fire and Marine Insurance Co.,* 66 F.R.D. 129, 132 (E.D.Pa.1975); *LaRocca v. State Farm Mutual Automobile Insurance Co.,* 47 F.R.D. 278, 280 (W.D.Pa.1969); *Henke v. Iowa Home Mutual Casualty Co.,* 249 Iowa 614, 87 N.W.2d 920 (1958). Eureka contends to the contrary that this case falls under Wigmore's second principle.[7] For several reasons, we agree with Eureka.

First, Wigmore's first principle presupposes the absence of secrecy between the parties at the time of communication. Here, although there was no secrecy with respect to the defense of tenant claims, Eureka assuredly was concealing from CTI

its consideration of legal action against the latter. Second, and closely related, Wigmore's first principle presupposes that the communication at issue was made in the course of the attorney's joint representation of a "common interest" of the two parties.[8] Here, although Fried, Frank was representing Eureka and CTI in a matter of common interest at the time the communications at issue were made, those communications were not made in the course of its representation on that matter; indeed, they were made in the course of representation distinctly not in the interest of CTI. The policy behind Wigmore's first principle—to encourage openness and cooperation between joint clients—does not apply to matters known at the time of communication not to be in the common interest of the attorney's two clients.

The communications sought here were made not only after the interests of CTI and Eureka diverged but after their common attorney knew they diverged and undertook separate representation of Eureka on this understanding. Eureka and Mr. Singer thus expressly understood there to be an attorney-client relationship between them distinct from the one to which CTI was a party. In this crucial respect, this case differs from the leading cases under Wigmore's first principle, where the party claiming a privilege (and his attorney) had no reasonable expectations of confidentiality for the privilege to protect.

Given Eureka's expectations of confidentiality and the absence of any policy favoring disclosure to CTI, Eureka should not be deprived of the privilege even if, as CTI suggests, the asserted attorney-client relationship should not have been created. We need not express any view on CTI's contention that Fried, Frank should not have simultaneously undertaken to repre-

---

**4.** 8 J. Wigmore Evidence § 2312 at 605–06.

**5.** *Id.* at 608.

**6.** *Id.*

**7.** Wigmore extracts this principle, as he does the first, from the reasoning of numerous cases. 8 J. Wigmore, *supra,* at 604 n. 3. None of the cases cited by Wigmore appears to be directly on point, presumably because attorneys typically steer clear of the sort of conflict of interest that gives rise to the situations with which Wigmore's second principle is concerned.

**8.** 8 J. Wigmore, *supra,* at 603, 604.

sent Eureka in an interest adverse to CTI and continued to represent CTI in a closely related matter. As Wigmore's second principle expressly states, counsel's failure to avoid a conflict of interest should not deprive the client of the privilege. The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable. We conclude, therefore, that Eureka was privileged not to disclose the requested documents.

## III. DELAY DAMAGES

Eureka requested $1.3 million in so-called delay damages. These consisted of financial carrying charges, losses from operating rental properties, and increases in advertising and sales costs, transfer taxes, and commitment fees which were incurred by reason of the failure to sell all the condominiums as soon as would have occurred but for the tenant actions vindicating § 602 rights. Its calculation of the amount of these items rested on two assumptions: (1) that in the absence of such tenant actions, closings on the units in phase I would have begun on November 1, 1979; and (2) that all units in phase I would have been sold by the end of March 1980. The district court rejected both assumptions. It found that even absent tenant actions Eureka would not have been able to begin closings until March 1980 because it lacked necessary approvals from federal and local authorities and from certain private institutions.[9] It further found that Eureka's projections of a five-month sellout were "seriously flawed" and "little more than guesswork."[10] Because neither of the assumptions on which Eureka's calculations rested were supported by the evidence, the court rejected the calculations.

The court found, nonetheless, that Eureka had suffered delay damages as a result of the tenants' actions and had carried its burden of establishing the amount of this injury with the "reasonable certainty" that District of Columbia law requires.[11] The injury the court found was of three sorts: (a) Delays in commencing sales caused Eureka to lose some potential sales and forced it to continue its sales effort longer than expected and in a less favorable market. (b) Even after sales were commenced, a similar effect was produced by the inability to tell prospective purchasers when they could close and therefore what financing would be available. (c) Tenant actions also damaged Eureka by diverting effort from other tasks; it was a "matter of common sense ... that if this effort had been expended in other ways the conversion would have been more successful."[12] We consider each of these in turn.

■ (a) The record supports the finding that the tenant actions delayed the beginning of Eureka's sales effort from September to November, 1979. CTI argues, however, that this delay in beginning sales did no harm, since Eureka would have received no money until a closing took place, and closings could not have begun until March 1980 in any case. This argument ignores the fact that the number of units Eureka could close on in March was determined by the sales which took place prior to the initial closing date. Had Eureka been able to commence sales as scheduled in September, it is probable that it would have been able to close on a larger number of units in March. That would have reduced Eureka's carrying charges and other expenses in subsequent months. The damages Eureka is entitled to under the rubric of lost sales are not, as the appellant seems to suppose, expenses incurred before March 1980, but rather additional expenses incurred after that date because units that would have

---

9. *Eureka Investment Corp., N.V. v. Chicago Title Insurance Co.,* 530 F.Supp. 1110, 1125 (D.D.C. 1982).

10. *Id.* at 1127.

11. *See Manes v. Dowling,* 375 A.2d 221, 224 (D.C.1977); *Pemberton v. OvaTECH, Inc.,* 669

F.2d 533, 541 (8th Cir.1982) (applying Wisconsin law); *Peters v. Lines,* 275 F.2d 919, 930 (9th Cir.1960) (applying California law).

12. *Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.,* 530 F.Supp. at 1129.

been sold by then (if there had been no delay in commencing sales due to tenant actions) remained unsold for some time thereafter.

 It is true that Eureka did not—and obviously could not—demonstrate particular lost sales. But in light of the evidence that sales conditions were particularly favorable in Fall 1979, it is reasonable to assume that if Eureka had started one month earlier it would have made by the end of each successive month at least the number of sales it in fact made at the end of the following month. Where the plaintiff has shown with this degree of certainty the fact of losses, courts will not deny recovery merely because it is difficult to determine the exact amount.

"In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." [13]

This general principle of the law of damages applies not only when the defendant is a tortfeasor who caused the injury complained of but also when the defendant is an insurance company.[14] We therefore affirm the district court's award of damages for expenses attributable to delay in beginning sales.

 As for (b) sales lost, and delay damages thereby caused, through uncertainty over closing dates: In light of the district court's finding that the closing was in any event dependent upon governmental and private permissions which were not obtained until March 1980, this uncertainty would have existed even if the tenants had not pursued their § 602 remedies, and any consequent damages are therefore not attributable to the actions against which CTI insured Eureka.[15] As for (c) delay damages Eureka suffered because tenant actions distracted it from other activities: The record provides no basis on which to determine what distractions Eureka may have endured because of the tenants' actions or what effects those distractions may have had on the overall conversion effort. Damages may not be awarded on the basis of mere speculation or guesswork.[16] Although it may be a matter of "common sense" that things would have gone better for Eureka if it had not been forced to deal with tenant claims under § 602, such conjectures are too speculative to support an award of damages, especially to a new business with no proven record and no experience in the Washington condominium market.

 Although we have found ample basis to support the award of delay damages on the basis of lost sales ((a) above), we have difficulty in sustaining the amount of the award. The district court did not describe how its $100,000 delay damages award was computed, or even specify the portions attributable to each of the three factors discussed above. Its only explanation was:

As trier of fact viewing the record as a whole the Court awards damages in the amount of $100,000, as representing a

13. *Bangor & Aroostook R.R. v. Brotherhood of Locomotive Firemen and Enginemen,* 442 F.2d 812, 822 (D.C.Cir.1971), *quoting Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

14. *Cf. Johnston v. Safeco Insurance Co. of America,* 727 F.2d 548 (5th Cir.1984); *Boston Securities, Inc. v. United Bonding Insurance Co.,* 441 F.2d 1302 (8th Cir.1971).

15. Although the district court observed that the failure to receive the necessary governmental approvals was "arguably" attributable to the

agencies' (apparently *ultra vires*) efforts to assist the protesting tenants, 530 F.Supp. at 1126, no finding of such causality was made. In any event, since Eureka did not contend that this failure, even if so caused, was a risk covered by the policy, *id.* at 1126–27, it would be improper to award damages for delay immediately produced by that circumstance.

16. *Story Parchment Co. v. Paterson Parchment Paper Co., supra,* 282 U.S. at 563, 51 S.Ct. at 250, *cited in Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982); *see also Fowler v. A & A Co.,* 262 A.2d 344, 349 (D.C.1970).

reasonable award for the injuries outlined above.[17]

This does not suffice. While damage awards are findings of fact which will not be disturbed unless clearly erroneous,[18] it is essential that the trial court give sufficient indication of how it computed the amount so that the reviewing court can determine whether it is supported by the record.[19]

> [T]he measure of damages and method of computation [must] be exposed so as to inform the litigants and afford a possibility of intelligent review.[20]

We remand to the District Court for redetermination of this item of damages and further articulation of the basis for its calculation.

## IV. THE ATTORNEY'S FEES ISSUES

Eureka presents two claims for attorney's fees: 1) attorney's fees incurred in defending and settling tenants' claims; 2) attorney's fees incurred in connection with this litigation against CTI. The district court rejected both claims. Eureka appeals the denial of both.

### A. *Attorney's Fees Related to the Tenant Actions*

Eureka seeks $67,656.38 in legal fees it paid to Fried, Frank for services rendered in connection with the tenant actions. Section 3 of the title insurance policy requires CTI, "at its own cost and without undue delay, ... [to] provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured ..." involving matters covered by the policy.

When Eureka informed CTI on May 23, 1979 of the tenants' section 602(b) actions filed on May 9th of that year, CTI undertook to fulfill its defense obligations under the policy by agreeing to pay Fried, Frank, then Eureka's attorney, for work performed in defense of the tenants' claims. CTI was billed directly by Fried, Frank for all such work until February 4, 1980.[21] At that point, disagreements concerning the advisability of settling with the tenants and CTI's liability for delay damages had caused such deterioration in relations between Eureka and CTI that litigation between the parties appeared imminent. As a result, Fried, Frank informed CTI that it could no longer represent both parties and that CTI should no longer pay Fried, Frank's fees.[22]

■ Because of its holding that CTI's failure to confess liability for delay damages caused by the tenant actions breached the contract of insurance and justified Eureka's decision to proceed on its own toward a resolution of the tenant actions,[23] the district court ruled correctly that CTI was "liable for the costs, if proven, of services performed by independent counsel in connection with Eureka's efforts to re-

---

17. 530 F.Supp. at 1128.

18. *Miles v. District of Columbia,* 510 F.2d 188, 196 (D.C.Cir.1975).

19. *See Hatahley v. United States,* 351 U.S. 173, 182, 76 S.Ct. 745, 752, 100 L.Ed. 1065 (1956).

20. *Safer v. Perper,* 569 F.2d 87, 100 (D.C.Cir. 1977).

21. Up to that date, CTI had paid Fried, Frank more than $62,000 in fees related to the tenant actions. *See* CTI Reply Brief at 45 (Aug. 16, 1982).

22. CTI characterizes this instruction as a "waiver" of Eureka's claims against its insurer for legal fees. *See* CTI Reply Brief at 47 n. 37.

However, a "waiver" of a claim requires "both knowledge of the right and an intention to relinquish it." 16 B. APPLEMAN, INSURANCE LAW AND PRACTICE § 9086 at 536 (1981). Nothing in the record suggests any intention on the part of Eureka to relinquish its claim to attorney's fees for the tenant actions. It seems more plausible to interpret Fried, Frank's instructions to CTI as a simple acknowledgment of the reality that CTI could not be expected to pay legal fees for consummation of a settlement to which it did not consent and that, consequently, CTI's liability for *all* damages, including delay damages and settlement expenses as well as attorney's fees, would have to be negotiated or litigated at a future date.

23. *See Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 530 F.Supp. 1110, 1118–22 (D.D.C.1982).

solve the tenants' challenge to title."[24] However, the district court found that Eureka's evidence was insufficient to support an award of $67,656.38 in unreimbursed attorney's fees and rejected the entire claim. We find that this ruling was clearly erroneous and remand to the district court for further proceedings to assess the amount of attorney's fees to which Eureka is entitled.

The district court relied on two factors in concluding that Eureka's evidence was insufficient. First, Eureka submitted only Fried, Frank's unitemized bills stating that the work related to tenant 602 claims. Daniel Singer, Eureka's principal legal adviser at Fried, Frank, testified at length at trial on other matters without providing any detailed information in support of the invoices.[25] Second, the tenant settlement was signed on February 5, 1980, and "[t]he bulk of the services performed by Fried, Frank ... [thereafter] related to various government approvals that would have been required even in the absence of the tenant actions."[26] According to the court, one of the invoices was for work performed between May 1 and August 5, 1980, long after the tenant dispute had been resolved. Since it was "implausible that Fried, Frank performed any services during this period relating to tenants' efforts to enforce section 602,"[27] and no evidence had been introduced to show what portion of the $67,656.38 was related to the tenant actions, the court could not apportion the fees claimed between services that were covered by the policy and those that were not. ▮ However, in a private action for damages an itemized bill is not necessary

to establish a *prima facie* case on the amount of attorney's fees. It is most important to note the distinction between claims for attorney's fees brought in the context of private damages actions and those made under a statute authorizing recovery of attorney's fees by prevailing parties in suits against the government or in civil rights cases. In the latter category of cases, the court must establish a "reasonable fee" for the legal services involved in the action.[28]

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.[29]

Time recordkeeping must be relatively detailed in such cases for several reasons not applicable to private damages actions. For instance, when fees are awarded to a prevailing party under a statute, hours may have to be allocated between time expended on claims on which the party in fact prevailed and hours spent on unsuccessful issues.[30] Moreover, the desire to maintain a continuing relationship with a client, the usual incentive for a law firm to charge only reasonable attorney's fees, is absent when fees are charged to the government or to another nonprevailing party. Attorneys in such cases "need fear

**24.** *Id.* at 1123–24; *see Transamerica Ins. Co. v. Keown,* 451 F.Supp. 397 (D.N.J.1978).

**25.** 530 F.Supp. at 1124.

**26.** *Id.*

**27.** *Id.*

**28.** *See Hensley v. Eckerhart,* 461 U.S. 424, 433 & n. 7, 103 S.Ct. 1933, 1939 & n. 7, 76 L.Ed.2d 40 (1983).

**29.** *Id.* at 1939. Interestingly, even in claims for attorney's fees in civil rights cases such as *Hens-*
*ley,* the appropriate response to a failure to establish *all* of the hours claimed is to *reduce* the award—not to disallow it completely as was done in this case. Fried, Frank time sheets included in CTI Exhibit 179 documented at least some of the hours claimed. Thus, even under the stricter evidentiary standard employed in civil rights cases, the district court ought to have allowed at least a partial award for the hours reflected in the time sheets.

**30.** *See id.* at 1940–41 & nn. 11–12.

no future loss of business to the firm if the fees they seek ... are unreasonable." [31] Consequently, "[s]pecial caution is required because of the incentive which the [federal agency's] 'deep pocket' offers to attorneys to inflate their billing charges and to claim far more as reimbursement then would be sought or could reasonably be recovered from most private parties." [32]

▬ In contrast, in a private damages action, the court is not asked to set the attorney's fees. Rather, once a finding of liability for attorney's fees has been made, the role of the trier of fact is the same as in any other case involving a claim for expenses as consequential damages—to determine whether the expense has in fact been paid or incurred, whether the expense is related to the wrong upon which liability has been based, and whether the expense was reasonable.[33] District of Columbia law has firmly established that submission of a paid bill, supported by testimony of the claimant or claimant's agent that the ex-

pense was occasioned by defendant's wrong, is sufficient *prima facie* evidence of the amount of damages.[34] Once a *prima facie* case of damages has been established by the claimant, the burden of production shifts to the opponent to go forward with evidence tending to mitigate or abate the damages or to undermine the credibility of the claimant's case.[35]

▬ The facts adduced at trial were clearly sufficient to meet Eureka's burden of establishing a *prima facie* showing of the amount of attorney's fees. The district court had before it Schedule V of Eureka Exhibit No. 125, prepared by Price Waterhouse, Eureka's expert accounting witness.[36] Exhibit 125 represented Price Waterhouse's expert opinion, based upon examination of Fried, Frank's invoices and Eureka's checks paying those invoices, that Eureka had paid Fried, Frank $67,656.38 "for services rendered in connection with tenant actions not reimbursed by Chicago

**31.** *Copeland v. Marshall,* 594 F.2d 244, 255 n. 59 (D.C.Cir.1978).

**32.** *Id.* at 250.

**33.** *See Hemminger v. Scott,* 111 A.2d 619, 620 (D.C.1955).

**34.** *See, e.g., Brewer v. Drain,* 192 A.2d 532, 534 (D.C.1963) (written estimates of repairs, plus testimony of claimants that repairs were necessitated by this collision and that payment had been made, "satisfied the requirements of a *prima facie* case of damages"); *Brooks v. Capital Fleets, Inc.,* 123 A.2d 916, 917 (D.C.1956) (paid bill is sufficient *prima facie* evidence of amount of damages absent suspicious circumstances); *Wright v. Capital Transit Co.,* 35 A.2d 183, 184–85 (D.C.1943) (paid bill from garage in business of making repairs supported by claimant's testimony that it was for repairs necessitated by the collision, is sufficient *prima facie* evidence of the reasonable amount of damage); *see also Witco Chem. Co. v. Consolidated Terminals Corp.,* 546 F.2d 631, 634 (5th Cir.1977) (written invoices and testimony of claimant's employee established a *prima facie* case of damages).

Although several of these cases involve itemized automobile repair bills or estimates, this court has found no cases *requiring* that expense bills be itemized or holding that evidence was insufficient to establish a *prima facie* case of damages solely because the bills or estimates submitted were unitemized. We have, however, discovered one rather musty case in which an

unitemized bill for medical services was accepted as *prima facie* evidence of reasonable damages when coupled with nothing more than the claimant's testimony as to the general nature of the services rendered. *See Nunan v. Timberlake,* 85 F.2d 407, 410 (D.C.Cir.1936).

Itemization of a bill does little more than support an inference that the bill was reasonable and was necessitated by the defendant's wrong. However, since such an inference can be supported by other evidence, itemization cannot be held to be a *sine qua non* in proving damages. In the present case, the facts that CTI had originally retained Fried, Frank to litigate the tenant actions and by its own admission had paid over $60,000 in legal fees to Fried, Frank, apparently on the basis of invoices no different *than those admitted at trial,* support an inference of reasonableness of the fees. Fried, Frank's billing system, which established separate matter numbers to which charges for services unrelated to the tenant actions were billed, supports an inference of necessity, as does the statement on the face of the invoices that charges for unrelated services had been excluded. *See CTI Ex. No. 179.*

**35.** *See, e.g., Brewer v. Drain,* 192 A.2d 532, 534 (D.C.1963); *Brooks v. Capital Fleets, Inc.,* 123 A.2d 916, 917 (D.C.1956); *Hemminger v. Scott,* 111 A.2d 619, 620 (D.C.1955).

**36.** *See* Supp.Trans. at S–226 (Eureka Exhibit No. 125 received in evidence).

Title Insurance Company."[37] John Leyes, a Price Waterhouse partner and certified Public Accountant, also testified at trial that the accounting firm had "excluded from the invoices actions which were not associated with the legal services, for things other than tenants' actions . . . ."[38] Eureka's managing director also testified that the bills were paid for legal services performed in resolving the tenant actions.[39]

Moreover, there was, contrary to the district court's holding, ample evidence in the record to support the conclusion that a substantial number of hours were expended by Fried, Frank in litigation and settlement of the tenant actions during the time period covered by the invoices. To begin with, the district court erroneously concluded that the invoices covered only services performed after February 4, 1980, when Daniel Singer wrote to CTI to indicate that they would no longer be billed directly for defense of the tenants' claims. Since the tenant settlement agreement was signed on February 5, 1980, the judge reasoned that Fried, Frank could not have performed much work in connection with the tenant claims thereafter.[40] However, the parties stipulated that "Fried, Frank did not send CTI statements for legal services performed from January 1, through midnight February 4, 1980."[41] Moreover, the May 1, 1980 invoice itself states that it covers services rendered on the tenant claims from "January 1, 1980 through March 31, 1980."[42] The record shows that substantial amounts of legal work were performed by Fried, Frank on the tenant settlement and related tenant matters between the beginning of January and February 4, 1980.[43]

Second, the district court erroneously concluded that "the record does not suggest that Fried, Frank performed work in connection with the settlement [after February 5, 1980]."[44] To the contrary, the record shows that Fried, Frank continued to perform substantial legal services for Eureka in connection with the tenant actions throughout the first half of 1980. These services included arranging for the formal dismissal of the tenant actions,[45] finalizing the escrow arrangements required by the tenant settlement agreements,[46] and opposing attempts by "hold-out" tenants to assert section 602(b) claims before the Department of Housing and Community Development.[47]

Third, the court concluded that one of the invoices was for work apparently performed between May 1 and August 5, 1980, a time so long after the resolution of the tenant dispute that it is "implausible that Fried, Frank performed any services during this period relating to tenants' efforts

---

**37.** Eureka Ex. No. 125, Schedule V, at 9. The exhibit went on to state that, based on a review of the invoices, the amount paid "includes only fees for services related to tenant actions."

**38.** Leyes testimony, Supp.Trans. at 201.

**39.** Astolfi testimony, Tr.Trans. at 403–04.

**40.** *See* 530 F.Supp. at 1124.

**41.** Trial Stip. 309.

**42.** *See* CTI Ex. No. 179 at 101, 271. CTI's own expert accounting witness conceded the same point. *See* Adler testimony, Supp.Trans. at S–426.

**43.** This work included the continued negotiation and drafting and the closing of the tenant settlement, *see* Singer testimony, Tr.Trans. at 96, 100–07, 175, Tr.Stip. 154, several extended meetings between Eureka and CTI, relaying information concerning the progress of the settlement negotiations and clarifying CTI's role in the settlement agreement, *see id.* at 91–107, 175, Eureka Ex. No. 73, CTI Ex. 242, and pursuit of the tenant actions on several fronts, *e.g.*, vacation of the Rental Accommodations Commission (RAC) injunction, involvement in an appeal to the RAC of the 602(b) ruling against Rozansky & Kay, negotiation of the Department of Housing and Community Development's threat to issue a cease and desist order grounded on the cloud placed on Eureka's title, and defense of litigation to enjoin Eureka from further conversion activities, *see id.* at 74–78, Eureka Ex. No. 61.

**44.** 530 F.Supp. at 1124.

**45.** *See* Eureka Ex. No. 105, 113, 134, 148; CTI Ex. No. 75.

**46.** *See* Eureka Ex. No. 103.

**47.** *See* Singer testimony, Tr.Trans. at 166–68; CTI Ex. Nos. 68, 69, 72.

to enforce section 602." [48] However, as Eureka's accounting expert indicated at trial, the date on the invoice did not necessarily mean that the services covered by that invoice were performed between that date and the date of the preceding invoice.[49] Rather, as the invoice itself indicated, the August 5 bill covered services performed between April 1, 1980 and June 30, 1980,[50] a period during which Fried, Frank was still involved in defending claims brought by "hold out" tenants.[51]

Finally, the court held that

[t]he bulk of the services performed by Fried, Frank after February 4, 1980, related to obtaining various governmental approvals that would have been required even in the absence of the tenant actions. Eureka presented no evidence that these services were paid for separately, or, if not, what portion of the $67,656.38 represented fees for these services.[52]

To the contrary, as has been noted above, both the Price Waterhouse exhibit and the testimony of John Leyes, Eureka's accounting expert, suggested that fees for services other than those involving the tenant actions had been excluded in calculating the fees claimed.[53] Leyes also specifically testified that the amount claimed in this action comprised only that portion identified as relating to the tenant actions out of total fees in excess of $110,000 paid by Eureka to Fried, Frank during the period in question.[54]

This evidence by itself would have been sufficient to meet Eureka's burden of proving a *prima facie* case on the amount of attorney's fees. However, the court also had before it CTI Exhibit No. 179, providing additional proof that Fried, Frank had billed services relating to the tenant actions separately from time spent in pursuit of Eureka's other interests.[55] The exhibit

---

**48.** 530 F.Supp. at 1124.

**49.** *See* Leyes testimony, Supp.Trans. at S–260. This was apparently a source of some confusion to the judge at trial. *See id.* at 259–60.

**50.** *See* CTI Ex. No. 179; *see also* Adler testimony, Supp.Trans. at S–426.

**51.** *See* Singer testimony, Tr.Trans. at 166–68; CTI Ex. No. 72.

It should also be noted that the amount claimed under the August 5 invoice was only $6,436.05. This represents less than ten percent of the attorney's fees claimed in this action and less than five percent of the total attorney's fees paid out by CTI and Eureka in connection with the tenant actions. It seems clear that the amount of fees charged by Fried, Frank in fact diminish, as one would have expected, as the tenant actions approached resolution. In any event, if the district court questioned the credibility of the August 5 invoice the appropriate response would have been to deny the fees claimed under that invoice rather than to deny recovery of fees entirely.

**52.** 530 F.Supp. at 1124.

**53.** *See supra* pp. 942–43.

**54.** Leyes testimony, Supp.Trans. at S–261.

**55.** The status of CTI Exhibit No. 179 is disputed by the parties. CTI claims that the exhibit was marked solely for identification, was not received in evidence, and is not a part of the

record in this case. *See* Letter from Roger E. Warin (attorney for CTI) to George A. Fisher (Clerk, United States Court of Appeals) (July 25, 1983). Eureka, on the other hand, contends that while the exhibit was never formally moved into evidence by CTI, it has been treated as being in evidence by both CTI and the *district court judge*. Eureka suggests that the failure to formally move the exhibit into evidence resulted from CTI's procedure of moving selected exhibits into evidence in a single letter to the district court after the close of trial rather than moving its exhibits into evidence as they were referred to during the course of the trial. *See* Letter from Stephen Sacks (attorney for Eureka) to George A. Fisher (Clerk, United States Court of Appeals) (July 27, 1983). CTI responds that its failure to move the exhibit formally into evidence was intentional, but that its own use of the exhibit in its briefs was inadvertent. *See* Letter from Roger Warin to George A. Fisher (August 1, 1983).

Although the docket reveals that this exhibit was never formally placed in evidence, we find that the exhibit was treated as evidence in the district court, and, therefore, will be treated as part of the record in this case. CTI's attorney showed a copy of the exhibit to James Adler, CTI's expert accounting witness, during the direct examination of that witness. Adler read extensively from the exhibit during his testimony. *See* Adler testimony, Supp.Trans. at S–426–28. Furthermore, the court had a copy of the exhibit before it during this testimony and relied upon its contents during its own colloquy with counsel and the witness:

demonstrates that Fried, Frank established separate accounts for the various matters handled by the firm for Eureka. Work concerning the condominium conversion as such, including the pursuit of required government approvals, purchase of the fee, and financing matters, were billed to one account. Services concerning the tenant actions, as well as early negotiations with CTI concerning the form and substance of, and CTI's possible contributions to, the tenant settlement, were billed to a separate account, and a third account was established to cover services rendered in connection with the litigation between Eureka and CTI.[56] Separate invoices were provided for each of these accounts.[57] Time sheets indicate that attorneys adhered to these billing distinctions in submitting their time charges.[58]

> Q. I would like to show you [the witness] CTI Exhibit No. 179, which contains [*sic*] those invoices.
> THE COURT: Dated May 1 and August 5. Adler testimony, Supp.Trans. at S–426. And, in response to the witness's assertion that he had not seen the time sheets contained in the exhibit, to back up the invoices that were also contained in the exhibit:
> THE COURT: You haven't seen the back-up?
> THE WITNESS: All I have seen is just this invoice, itself.
> THE COURT: Then you didn't show him the exhibit?
> MR. WARIN: He has got the entire exhibit in front of him.
> THE WITNESS: But the invoice, itself, comes with just the invoice.
> THE COURT: Now wait a minute. CTI Exhibit 179 contains the back-up, right?
> MR. WARIN: I think his point is, all Price Waterhouse looked at was the invoice.
> THE COURT: But he went beyond that and said he hasn't seen the underlying supporting material.
> The underlying supporting material seems to be in the exhibit. It is a great big, thick exhibit with all the time charges that have been made by the firm.
> You didn't analyze those?
> THE WITNESS: No, I didn't.
> *Id.* at S–427–28.

Moreover, CTI cited Exhibit No. 179 before both the district court and this court. *See* CTI Post-trial Brief at 111 (October 20, 1981); CTI Reply Brief at 34 n. 23 (August 18, 1982).

Rule 10(e) of the Federal Rules of Appellate Procedure provides that

In sum, it cannot be said that Eureka failed to meet its burden of producing evidence sufficient to establish a *prima facie* case on the amount of attorney's fees paid by Eureka in connection with the tenant actions. We therefore remand this issue to the district court for entry of an appropriate award of attorney's fees.

### B. *Attorney's Fees Related to the Present Litigation*

Eureka's claim for the award of attorney's fees incurred in this action presents a wholly different picture, however. It is well established that the American rule ordinarily bars the award of attorney's fees.[59] It is equally well established that a successful litigant may recover attorney's fees "when his opponent has acted 'in bad faith, vexatiously, wantonly, or for

> [i]f anything material to either party is omitted from the record by error or accident or is misstated therein, ... the court of appeals, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected....

A similar rule has been invoked to permit the court of appeals to consider against defendant an exhibit which had been marked for identification but which, apparently through oversight, had not been introduced in evidence, where the defendant had referred to the exhibit in its brief and reproduced it in its appendix. *See Williams v. Pennsylvania R.R. Co.*, 313 F.2d 203, 209 (2d Cir.1963). We hold that in view of the treatment of CTI Exhibit No. 179 as evidence at trial and on appeal, its omission from the record was, if not accident, error. Therefore, we directed the parties to submit a copy of the exhibit and have treated it as part of the record on appeal.

**56.** *See* CTI Ex. No. 179 at 101262–65, 101296.

**57.** *See id.* at 101269–72, 101276, 101278–80.

**58.** To the miniscule degree that services described on the time sheets appear to have been charged to the wrong accounts, the records consistently tend to bill to the conversion project or to the CTI-Eureka litigation accounts time that should have been charged to the tenant actions account.

**59.** *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245, 95 S.Ct. 1612, 1615, 44 L.Ed.2d 141 (1975); *Wolf v. Cohen*, 379 F.2d 477, 480 (D.C.Cir.1967).

oppressive reasons.' "[60] The "bad faith" exception to the general rule against award of attorney's fees is a narrow one, however, to be applied only in exceptional circumstances.[61] The district court correctly found that the facts of this case do not fit within its narrow exception.[62]

■ CTI's failure to confess its liability for Eureka's delay damages may have been wrongful and a breach of its obligations under the policy, but it cannot be said that this error rose to the level of bad faith. As the court below observed, CTI simply failed "to recognize promptly that its representative Cooney had provided Eureka with coverage for a novel and substantial risk."[63] An insurer's failure to respond immediately to a claim does not necessarily amount to bad faith justifying an award of attorney's fees incurred in subsequent litigation between the insurer and the insured,[64] particularly where, as here, "no past experience or body of interpretation provided guidance" to the parties.[65] CTI's overall "good faith" toward its insured is amply demonstrated by its prompt assumption of responsibility for defense of the tenant ac-

tions before Eureka had even been named as a respondent in those actions. Thus, the trial court's denial of Eureka's demand for attorney's fees incurred in this litigation must be upheld.

CONCLUSION

We affirm the trial court's finding of liability and its award of settlement costs for the reasons given in its opinion; we sustain the district court's ruling on the discovery issue; we reverse in part the award of delay damages and remand for a new determination of their amount; and finally, we sustain the refusal to award Eureka attorney's fees incurred in its action against CTI but remand to assess the attorney's fees Eureka incurred in reaching a settlement with the tenants.

*So ordered.*

---

**60.** *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973) (citing 6 J. Moore, Federal Practice ¶ 54.77[2], at 1709 (1972 ed.)).

**61.** *Cornwall v. Robinson,* 654 F.2d 685, 687 (10th Cir.1981); *F.W. Berens Sales Co. v. McKinney,* 310 A.2d 601, 602 (D.C.1973) (attorney's fees appropriate only if "the very temple of justice has been defiled") (citing 6 J. Moore, Federal Practice ¶ 54.77[2], at 1709 (1972 ed.)). Contrary to Eureka's contention, the standard of bad faith is no lower in the case of an insurer than it is for other parties. *See, e.g., Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley,* 638 F.2d 670, 676 (4th Cir.1980); *Continental Ins. Co. v. Lynham,* 293 A.2d 481, 483 (D.C.1972); *McIntosh v. Aetna Life Ins. Co.,* 268 A.2d 518 (D.C.1970). Rather, the unique vulnerability of an insured, in need of the immediate defense support or medical services for which it has contracted, may often give rise to facts supporting a finding of bad faith when an insurer reneges on the promises of its policy or takes advantage of the circumstances to "bully" its insured into a settlement. *See, e.g., Siegel v. William E. Bookhultz & Sons,* 419 F.2d 720 (D.C.Cir.1969) (insurer abandoned its defense of insured, leaving insured helpless).

**62.** *See* 530 F.Supp. at 1129–30.

**63.** *Id.* at 1129. Indeed, early in the trial, the district judge had difficulty identifying the language of Note II as a recognizable genre of title coverage. *See* Singer testimony Tr.Trans. at 85. Eureka's own lawyer testified that his approach to insuring against tenant actions was "a novel notion," and that "people had not looked at the issue of condominium conversion theretofore in the way I looked at it." *Id.* at 86.

**64.** *See Continental Ins. Co. v. Lynham,* 293 A.2d 481, 483 (D.C.1972).

**65.** 530 F.Supp. at 1117. Nor can bad faith be found from CTI's abandonment at trial of its position that the insurer was liable for delay damages only if the tenants proved successful. Although we do not accept this position (it is no longer in the case), it has the support of legal authority elsewhere and therefore cannot be termed frivolous. *See American Legion Ed Brauner Post No. 307, Inc. v. Southwest Title and Ins. Co.,* 253 La. 608, 218 So.2d 612 (La.1969). CTI's ultimate abandonment of this defense worked to Eureka's advantage by admitting the insurer's liability for delay damages.